## Zerbe Township School District v. Lark et al.

*Richard Henry Klein,* for plaintiff.

*Carpenter & Carpenter,* for Commonwealth, claimant.

LARRABEE, P. J., twenty-ninth judicial district, specially presiding, August 10, 1948.—The Department

of Revenue of the Commonwealth of Pennsylvania makes a claim of $3,899.45 against the funds in the hands of the receiver, appointed by this court, which fund consists of royalties derived from coal mined on the five tracts of land, hereinafter listed, which were purchased by the Commissioners of Northumberland County at county treasurer's sale.

This claim is based on a certain tax settlement and resettlement for the corporate net income tax, for the year 1939, due from the Great Anthracite Coal Company, which was formerly the owner of the tracts of coal land involved and which tracts were conveyed by the Great Anthracite Coal Company to the grantees named and on the respective dates as follows:

| Date of Deed | Deed Book Page | | Date of Recording and Grantees | |
|---|---|---|---|---|
| Nov. 3, 1939 | 279 | 234 | Nov. 8, 1940 | (Joseph Barke) |
| Feb. 5, 1940 | 278 | 603 | Feb. 8, 1940 | (Henry Dziekonski) |
| May 24, 1940 | 273 | 658 | Aug. 9, 1940 | (Claude Moore) |
| Aug. 8, 1940 | 290 | 210 | Mar. 8, 1943 | (Mary Jane Buckley) |
| Sept. 5, 1940 | 298 | 41 | Nov. 12, 1943 | (Malvin Beadle) |

The Commonwealth contends that on April 23, 1941, when the original settlement of the corporate net income tax of the Great Anthracite Coal Company for the year 1939 was made, that the settlement was based on an erroneous report of earnings by the said coal company, and that subsequently on July 1, 1946, there was a resettlement of this corporate net income tax for the year 1939, for the sum of $3,941.69, and after applying a credit thereon of the amount of said original settlement of $42.24, it left a balance due of $3,899.45. The Commonwealth now contends that by virtue of this resettlement made on July 1, 1946, the amount then found to be due constitutes a lien which, in priority, takes effect as of the date of the first settlement made on April 23, 1941.

Respondents, the Zerbe Township School District and the Township of Zerbe, contend that the lands in question were not subject to a lien for this tax when

they were conveyed by the Great Anthracite Coal Company to the respective grantees hereinafter named and for that reason the lands are free of any lien for said taxes.

A hearing was had on July 15, 1948, at which testimony was offered and the Commonwealth then stated that the amount of its claim for corporate net income taxes is $3,899.45.

## Findings of fact

The court adopts the following findings of fact that were stipulated of record by the parties:

1. The receiver's first and second accounts show royalty received from county owned lands formerly owned by the West Line Coal Company. These lands were acquired directly from the Philadelphia and Reading Coal and Iron Company by deed dated December 23, 1939, and recorded December 26, 1939, in Deed Book 273, page 364. The title to these lands never was in Great Anthracite Coal Company.

2. The receiver's first account shows royalty received from county owned lands formerly owned by Steam Coals, Inc. (Claude Moore), by North Line Coal Company (Dziekonski), by North Line Coal Company (Beadle) and by Nell Frantz. The receiver's second account shows royalty received from county owned lands formerly owned by Nell Frantz.

(a) The lands of Claude Moore were sold by the county treasurer to the county commissioners on April 29, 1943. He acquired them from the Great Anthracite Coal Company by deed dated May 24, 1940, recorded August 9, 1940, in Deed Book 273, page 658.

(b) The lands of North Line Coal Company (Dziekonski) were sold by the county treasurer to the county commissioners on April 29, 1943. Henry Dziekonski acquired them from the Great Anthracite Coal Company by deed dated February 5, 1940, and recorded February 8, 1940, in Deed Book 278, page 603.

(c) The lands of North Line Coal Company (Beadle) were sold by the county treasurer to the county commissioners on April 23, 1943. Malvin Beadle acquired them from the Great Anthracite Coal Company by deed dated September 5, 1940, and recorded November 12, 1943, in Deed Book 298, page 41.

(d) The lands of Nell Frantz were sold by the county treasurer to the county commissioners on April 29, 1943, *except* parts of the Trevorton Estate Tracts which were sold on January 25, 1945, by the county treasurer to the county commissioners.

Nell Frantz acquired them from Mary Jane Buckley by deed dated August 8, 1940, recorded March 8, 1943, in Deed Book 290, page 212. Mary Jane Buckley acquired them from the Great Anthracite Coal Company by deed dated August 8, 1940, and recorded March 8, 1943, in Deed Book 290, page 210.

3. The receiver's first account shows royalty received from county owned lands formerly owned by H. Marshall Reinhardt. These lands of H. Marshall Reinhardt were sold by the county treasurer to the county commissioners on April 29, 1943, *except* parts of the Trevorton Estate which were sold on January 25, 1945, by the county treasurer to the county commissioners. He acquired some of these lands (354 acres of the Thomas Grant tract) by deed from Edward Bush dated January 21, 1941, and recorded January 8, 1945, in Deed Book 304, page 25. He also acquired some of these lands (William Wilson, 80 acres, William Wilson, 206 acres and 37 acres of Trevorton Estate Tracts) from B. R. B. Coal Company by deed dated August 23, 1944, and recorded January 8, 1945, in Deed Book 287, page 227. B. R. B. Coal Company had acquired its land from Edward Bush by deed dated January 21, 1941, and recorded the same date in Deed Book 270, page 429. Edward Bush acquired the land from Joseph Barke by deed dated November 19, 1940, and recorded November 20, 1940, in Deed Book 279,

page 262. Barke had acquired the land from the Great Anthracite Coal Company by deed dated November 3, 1939, and recorded November 8, 1940, in Deed Book 279, page 234.

4. The receiver's first and second accounts show royalty received from county owned lands formerly owned by Webster Yocum. The lands of Webster Yocum were sold by the county treasurer to the county commissioners on January 25, 1945. He acquired them as follows:

(a) The 153-acre tract. Webster Yocum acquired this tract from Edward Bush by deed dated January 21, 1941, and recorded January 8, 1945, in Deed Book 304, page 24. Bush acquired it from Joseph Barke by deed dated November 19, 1940, and recorded November 20, 1940, in Deed Book 279, page 262.

(b) The 59-acre tract (coal reserve).. Webster Yocum acquired this tract from B. R. B. Coal Company by deed dated August 23, 1944, and recorded January 8, 1945, in Deed Book 287, page 228. B. R. B. Coal Company acquired it from Edward Bush by deed dated January 21, 1941, and recorded January 21, 1941, in Deed Book 270, page 429. Edward Bush acquired it from Joseph Barke by deed dated November 19, 1940, and recorded November 20, 1940, in Deed Book 279, page 262.

Joseph Barke acquired both tracts from the Great Anthracite Coal Company by deed dated November 3, 1939, and recorded November 8, 1940, in Deed Book 279, page 234.

5. The Great Anthracite Coal Company owned 58.4 acres of land which were purchased by the county commissioners from the county treasurer at the tax sale held on April 29, 1943. These were: 40.6 acres of the John Cowden Tract; 17.6 acres of the George Prince Tract; .2 acres of the Isaac Zeigler Tract.

These portions of the said tract were not sold by the Great Anthracite Coal Company prior to the said

treasurer's sale. The Great Anthracite Coal Company had acquired title to them as part of the 1,463.7 acres acquired from the Philadelphia and Reading Coal and Iron Company by deed dated December 20, 1938, and recorded December 20, 1938, in Deed Book 262, page 660.

Neither the receiver's first nor his second account shows any royalty from a part of these 58.4 acres of land.

The court also finds as a fact that the corporate net income tax of the Great Anthracite Coal Company for the year 1939, as shown in the settlement of April 23, 1941, was paid on February 3, 1940.

### Discussion

At the outset it may be said that so far as the claim of the Commonwealth is based on the contention that the original tax settlement made on April 23, 1941, thereby created a lien on the two tracts of land conveyed by the Great Anthracite Coal Company to Mary Jane Buckley and Malvin Beadle, on August 8, 1940, and September 5, 1940, respectively, for the reason that the deeds for these two tracts were not recorded until March 8, 1943, and November 12, 1943, respectively, then clearly the Commonwealth has no valid basis to make this claim. This for the reason that the Commonwealth admits the amount of the corporate net income tax for the year 1939, from the Great Anthracite Coal Company, in the amount of $42.24, as represented in said tax settlement, was actually paid by the Great Anthracite Coal Company *on February 3, 1940*.

Thus it appears obvious that the tax settlement made on April 23, 1941, is merely a record of a tax *already paid* and nothing more and it is too clear for argument there was no unpaid tax at that time upon which to base a lien against these two mentioned tracts, even though the deeds to them were not on record. Further-

more, it is self-evident that no lien created in April 1941, had such tax not been paid, could attach to the three tracts conveyed by the said coal company to Joseph Barke, Claude Moore and Henry Dziekonski, which deeds were placed on record in 1940, nearly a year prior to the said settlement.

The Commonwealth bases its claim solely on the theory advanced that the amount of taxes of $3,899.45, that was discovered five years later to be due from the Great Anthracite Coal Company as shown by the resettlement made on July 1, 1946, thereby constitutes a lien that relates back and takes effect as of the date of the original tax settlement made on April 23, 1941, on a smaller tax, and which tax it is admitted was actually paid on February 3, 1940.

We are of the opinion that if the Commonwealth did not obtain a lien by virtue of a tax settlement, or resettlement, prior to September 5, 1940, the date of the execution and delivery of the last of the five deeds involved, it does not have a valid claim to any of the royalties in the hands of the receiver unless it shall be determined that the date of recording the deeds to Mary Jane Buckley and Malvin Beadle is to govern as to those two tracts instead of the date when the deeds were actually made and delivered.

It should be remembered that the question before us is not whether the Commonwealth has the right to proceed against the Great Anthracite Coal Company for the collection of any corporate net income taxes which are properly due the Commonwealth from that corporation.

We are concerned here solely with the question of whether the corporate net income tax represented by this claim of the Commonwealth, of $3,899.45 was a valid, existing lien upon this real estate of the Great Anthracite Coal Company prior to the date of the several conveyances of said real estate by that company to other persons or corporations.

In passing on this question it is well established that at common law the State taxes are not a lien, and do not become a lien unless so created by statute. It was said by the Supreme Court of Pennsylvania, in In re Wilson, Commonwealth's Appeal, 4 Pa. 164:

"The account settled by the auditor-general at common law, gave the Commonwealth no lien. The Commonwealth's lien on the land of her debtor is created and exists in pursuance of the Acts of the Legislature."

Therefore, this claim of the Commonwealth must be predicated on statutory authority for its validity.

The amendment of The Fiscal Code of April 9, 1929, P. L. 343, sec. 1401, enacted May 28, 1943, P. L. 794, which amends the Acts of June 3, 1933, P. L. 1474, and June 11, 1935, P. L. 303, provides as follows:

"All State taxes . . . and all public accounts settled against any corporation . . . including interest thereupon, shall be a first lien upon the franchises and property, both real and personal, of such corporation, association, or person, *from the date of settlement.*" (Italics supplied.)

By the acts of the Legislature, therefore, State taxes, such as are here claimed, are a lien "*from the date of settlement*" as entered in the proper department office at Harrisburg. That is, when they are settled by the Auditor General and approved by the State Treasurer: Commonwealth v. Central Realty Company et al., 338 Pa. 173 (1939).

Such settlement is defined in Commonwealth of Pennsylvania v. New York, Pennsylvania and Ohio Railroad Company, 188 Pa. 169, 178, as follows:

"An 'account' or 'settlement' is a physical, tangible thing, a paper with figures and writing upon it, signed by the Auditor General and State Treasurer, endorsed, copied into a ledger and filed away in its appropriate place."

"At common law an account settled by the Auditor General gave the Commonwealth no lien. . . . Whatever lien the Commonwealth has comes from the Legislature, and the construction must be a strict one, being in derogation of the common law": Commonwealth v. Corner Realty Co. et al., 45 D. & C. 199 (1942).

In Commonwealth v. Repplier Coal Co., 348 Pa. 372, 380, it was said:

"In approaching these questions, it must be remembered that this is a taxing statute which must be strictly construed,"
and

"It must be remembered that we are dealing with a taxing statute which is to be strictly construed against the Commonwealth." (p. 392)

It was declared in Loeb v. Benham et al., 153 Pa. Superior Ct. 601, "that tax acts always receive a strict construction in favor of the taxpayer": Citing Dixon's Case, 138 Pa. Superior Ct. 385.

Other cases which construe various taxing statutes and set forth the principle that taxing statutes shall be strictly construed are Pittsburgh Terminal Coal Company appeals, 83 Pa. Superior Ct. 535; Scranton v. O'Malley Manufacturing Co., 341 Pa. 200; Philadelphia v. Goldfine, 151 Pa. Superior Ct. 59, and Speck v. Phillips et al, 160 Pa. Superior Ct. 365. This rule is also declared in section 58 of article 4 of the Statutory Construction Act of May 28, 1937, P. L. 1019.

In support of its claim the Commonwealth contends that as to the tracts conveyed by Great Anthracite Coal Company to Mary Jane Buckley and Malvin Beadle the dates of the recording of these deeds are controlling on the question of when these lands became subject to this tax lien, rather than the dates of the execution and delivery of said deeds.

The only recording act protecting lien creditors is the Act of June 12, 1931, P. L. 558, which provides that a deed not recorded is invalid as to the holder of any

judgment, *duly entered in the Prothonotary's office* of the county in which the lands in question are situated, if such judgment is entered prior to the recording of the deed.

"All deeds, conveyances, contracts, and other instruments of writing wherein it shall be the intention of the parties executing the same to grant, bargain, sell, and convey any lands, tenements, or hereditaments situate in this Commonwealth, upon being acknowledged by the parties executing the same or proved in the manner provided by the laws of this Commonwealth, shall be recorded in the office for the recording of deeds in the county where such lands, tenements, and hereditaments are situate. Every such deed, conveyance, contract, or other instrument of writing which shall not be acknowledged or proved and recorded, as aforesaid, shall be adjudged fraudulent and void as to any subsequent bona fide purchaser or mortgagee or holder of any judgment, duly entered in the prothonotary's office of the county in which the lands, tenements, or hereditaments are situate, without actual or constructive notice unless such deed, conveyance, contract, or instrument of writing shall be recorded, as aforesaid, before the recording of the deed or conveyance or the entry of the judgment under which such subsequent purchaser, mortgagee, or judgment creditor shall claim."

The Department of Revenue takes the position that its lien, by virtue of the tax settlement entered on the books of the Department of Revenue at Harrisburg, is protected by said Act of 1931.

We conclude that the Recording Act of 1931 protects a creditor only as to the extent *specifically set forth* in the said Act of 1931, and therefore the Commonwealth is not protected merely because it has a lien by virtue of the tax settlement in the department's office at Harrisburg.

The law as set forth in Cover v. Black, 1 Pa. 493; Charles Davey v. C. Wesley Ruffell, 162 Pa. 443, and Beman Thomas Co. v. White, 269 Pa. 261, has been changed by the Recording Act of June 12, 1931, P. L. 558 (21 PS §351), only to the extent of protecting judgment liens recorded in the prothonotary's office of the county where the real estate is situated. A lien under section 1401 of The Fiscal Code (72 PS §1401) is not, per se, a lien which is protected by the Recording Act of 1931.

In Commonwealth v. Central Realty Co., 338 Pa. 172, it was held that under the provisions of the Act of June 15, 1911, P. L. 955, all State taxes imposed against a corporation shall be a first lien upon the franchise and property, both real and personal, of such corporation, *from the date when they are settled by the Auditor General and approved by the State Treasurer*, and that it is not necessary for the lien to be filed in the county in which the real estate of the corporation is situated in order to take precedence over other lien creditors or subsequent purchasers.

However, we find nothing in this decision which, in our opinion, differs from the views expressed herein on the specific question before us.

In view of the undisputed testimony we find that title to the several tracts of coal land involved in this dispute were conveyed out of the Great Anthracite Coal Company prior to April 23, 1941, the date *when the original settlement was made* of the corporate net income tax of the Great Anthracite Coal Company for the year 1939.

The Recording Act of 1931 has been limited to its exact language and cannot even be extended by implication to apply to deeds executed prior to 1931: The Farmer's National Bank and Trust Company of Reading v. Berks County Real Estate Co., 333 Pa. 390 (1939).

Therefore, in our opinion, since the Act of 1931 does not protect the Commonwealth any more than it would an individual creditor the date of the deeds to the land accompanied by the delivery of the deeds, if prior in time to the date of the settlement of April 23, 1941, though unrecorded at the time, passed a title free of any lien by reason of said tax settlement. As already pointed out, in view of the admitted fact that the tax shown on said tax settlement of April 1941 had already been paid by the Great Anthracite Coal Company in February 1940, therefore it could not have been a valid lien at the time of said settlement.

As opposed to the contention of the Commonwealth as to what constitutes the effective date of the transfer of real estate out of the Great Anthracite Coal Company, and such as would no longer subject said lands to this tax lien, it is contended by respondents, the Zerbe Township School District and the Township of Zerbe, that the effective date of the transfer is the date of the execution and delivery of the deed, and that date of delivery is presumed to be the date of the execution of the deed.

It was said in Chambley et al. v. Rumbaugh et al., 333 Pa. 319 (1939):

"The signing, sealing, acknowledging and recording of a deed constitute prima facie evidence of its delivery, or, as it is sometimes stated, give rise to a presumption of delivery, which, however, is merely a factual presumption and, as such, rebuttable. Whether there was a delivery in fact in any given case depends upon the intention of the grantor as shown by his words and actions and by the circumstances surrounding the transaction, and constitutes a question to be determined from all the evidence by the jury, or, in equity proceedings, by the chancellor."

It is undisputed that the deeds from the Great Anthracite Coal Company to three of the tracts of land in question, to wit, those to Joseph Barke, Henry

Dzienkonski and Claude Moore were on record, on or before November 8, 1940, and the other two deeds, to wit, to Mary Jane Buckley and to Beadle were recorded on March 8, 1943, and November 12, 1943, respectively.

As there was no settlement of the 1939 corporate net income tax of the Great Anthracite Coal Company made until April 23, 1941, it is self-evident that these deeds from said coal company to Joseph Barke, Henry Dziekonski and Claude Moore were on record before the date of the settlement.

On the question of when the deed from the Great Anthracite Coal Company to Mary Jane Buckley, bearing date of August 8, 1940, was made and delivered, the court has before it the testimony taken at the hearing before Judge Larrabee, in this same equity proceeding, on April 10, 1946, in which one of the defendants in said equity suit, Nell Frantz, had raised questions relative to her title to the lands here in question. Accordingly, the court takes judicial notice of this testimony and applies it to the instant case. At that hearing Frank J. Neiman testified that he and one Arthur Shutts were acting as agents for Nell Frantz in looking after her coal lands in said Zerbe Township, and as such agent he attended to the recording of the deed of Mary Jane Buckley to Nell Frantz, also the recording of the deed from the Great Anthracite Coal Company to Mary Jane Buckley, conveying the same lands and both deeds were placed on record on March 8, 1943. When asked why he did not record the deed from the Great Anthracite Coal Company to Mary Jane Buckley until the same date when he recorded the deed from Mary Jane Buckley to Nell Frantz, Neiman replied he did it "to complete the chain of title", and also added he had "neglected" to put the deeds on record. He further said that he knew, so far as the records in the office of the Recorder of Deeds showed, that title in these lands was in the Great Anthracite Coal Company from 1940 to 1943, and

admitted that during all that period he had possession of both of these deeds. This testimony remains undisputed on the record and is convincing to us that the deed from the Great Anthracite Coal Company to Mary Jane Buckley was delivered to her agent, Neiman, on the date of its execution and acknowledgment, to wit, August 8, 1940.

We also find in the last paragraph of finding of fact no. 2, as stipulated to by counsel, that Mary Jane Buckley conveyed this land to Nell Frantz on August 8, 1940, and that Mary Jane Buckley acquired title to it from the Great Anthracite Coal Company by deed dated August 8, 1940, and recorded on March 8, 1943. Therefore, it is self-evident that Mary Jane Buckley took title and had this deed from the Great Anthracite Coal Company delivered to her on August 8, 1940, otherwise she could not have conveyed this land on that same date to Nell Frantz.

There is no testimony before the court as to when the deed from the Great Anthracite Coal Company to Beadle was actually delivered to said grantee, or as to the intention of the grantor as to such delivery. Therefore, the court, sitting as a chancellor, rests on the presumption that this deed was delivered to said grantee on the date when it was executed and acknowledged, to wit, September 5, 1940, and which was several months prior to April 23, 1941, the date of the original settlement for the tax for the year 1939.

It was said in Hall el al. v. Benner, 1 P. & W. 402 (p. 407):

"Prima facie every deed is supposed to be made the day it bears date. . . . But it takes effect from, and therefore has relation, to the time, not of the date, but of its delivery; and this is always presumed to be the time of its date, unless the contrary do appear."

And in Geiss et ux. v. Odenheimer, 4 Yeates 278, Chief Justice Tilghman said:

"The very authority in 2 Inst. 674, shows that the real time of delivery of a deed may be shown in evidence. The date shall be intended the time of delivery unless the contrary is proved; the presumption stands until it is removed by testimony."

And Barncord v. Kuhn, 36 Pa. 383, holds that a deed takes effect from the date of its delivery. Therefore, in the present controversy the date of the deed is presumed to be the date of delivery, and in the absence of any testimony to the contrary we find the date of execution and acknowledgment of these deeds is the date when they were presumed to have been delivered to the grantees respectively.

We are of the opinion that to enable the Commonwealth to secure a valid lien against these lands for the corporate net income tax, for the year 1939, there must have been a settlement of that tax made prior to the date of the execution and delivery of the five deeds to the tracts in question.

It is undisputed that the first settlement made by the Great Anthracite Coal Company of its corporate net income tax for the year 1939 was made on April 23, 1941. Therefore it is self-evident that this settlement was made subsequent to September 5, 1940, the date of the execution and delivery of the last of the five deeds from the Great Anthracite Coal Company to the tracts of land involved in this matter.

Even if we accepted as correct, which we do not, the contention of the Commonwealth that a resettlement of said taxes made on July 1, 1946, should thereby date back and take effect as a lien on said lands as of the date of the original settlement, April 23, 1941, nevertheless, the Commonwealth by its own argument would still have no valid claim on this fund of royalties for the obvious reason that there was no lien created prior to the execution and delivery of these deeds. In other words, the Great Anthracite Coal Company had

conveyed the title out of it before ever the said lien was created.

If the contention of the Commonwealth represented the correct rule on this question then it is obvious that as to whether they were subject to any liens in favor of the Commonwealth, the record as to encumbrances on lands descending from a corporation in Pennsylvania might frequently be in a confused and unsettled condition.

If the titles to these lands formerly owned by said coal company were to be subject to such a result from a resettlement of the corporate net income tax due for any year prior to the date of the conveyance out of said company, and if such a resettlement, made several years after the original settlement, should constitute a valid lien to take effect *as of the date of the original settlement* then it is manifest that a purchaser from the corporation could never be sure when his lands were unencumbered.

Such a contention savors too strongly of the countenancing of secret liens, and the Supreme Court of Pennsylvania said, more than a hundred years ago, in In re Wilson, Commonwealth's Appeal, 4 Pa. 164, "the law abhors all secret liens". We cannot believe the legislature ever intended such a result as is contended for by the Commonwealth.

We are of the opinion that when a prospective purchaser or subsequent owner follows the prescribed statutory procedure by requesting from the Department of Revenue a certificate of liens existing in favor of the Commonwealth against a corporation and the department issues such certificate it is bound by the statements of the tax settlement as shown in that certificate and the prospective purchaser or subsequent owner of land has a right to rely positively on the statements contained in its certificate of lien. He should not have to assume the added risk of having a lien entered on the land through a later resettlement

which, in its effect, would amount to a secret lien.

At the hearing held on July 20, 1948, the Commonwealth offered in evidence a certificate containing an excerpt from the records of the Department of Revenue showing a resettlement of said 1939 corporate net income taxes of the Great Anthracite Coal Company made on July 1, 1946, and this excerpt also showed a settlement on April 23, 1941, of the same taxes but with no amount appearing on the certificate.

It was explained by the representative of the Department of Revenue who testified on behalf of the Commonwealth that the reason no amount appeared on the certificate was that the original settlement of $42.24 was *paid* by the Great Anthracite Coal Company on February 3, 1940, and after applying that sum on the resettlement figure of $3,941.69, left a balance due the Commonwealth of $3,899.45.

Counsel for respondents, the School District of Zerbe Township and the Supervisors of Zerbe Township, who are opposing this claim of the Commonwealth, then offered in evidence two certificates issued by the Department of Revenue of the Commonwealth to respondents, one bearing date of May 10, 1948, and the other dated July 8, 1948, and in neither of these certificates does the settlement date April 23, 1941, appear, although in each of the certificates the resettlement made on July 1, 1946, in the amount of $3,899.45 does appear.

The representative of the Department of Revenue, when confronted with these certificates issued by his department and which conflicted with the certificate presented by this representative at the hearing, explained that "it is a mistake made in his department" and he added that he thought the certificate should not have been issued without containing the date of this original settlement on April 23, 1941.

Furthermore, this representative of the Department of Revenue admitted on cross-examination that this

alleged mistake made on two separate occasions when the two separate certificates referred to were issued, to wit, one May 10, 1948, and the other on July 8, 1948, was made by two different clerks of the Department of Revenue, whom he said had respectively prepared, separately, respondents' Exhibit Nos. 1 and 2, the two certificates issued to respondent on the above stated dates.

This witness further testified that he noticed the date April 23, 1941, was on the original records of his department shortly after the first hearing on this matter was held on May 11, 1948. However, it is readily apparent from an examination of the lien certificate prepared by a clerk in the Department of Revenue, and bearing date of July 8, 1948, and which comprises respondents' Exhibit No. 2, that it wholly failed to show thereon the date of the original settlement of April 23, 1941.

We must be frank in stating that there should be no confusion or mistake with such official records that may fasten important liens on real estate in the hands of innocent persons for value without notice. Our citizens are entitled to rely implicitly on the accuracy of such certificates.

Surely respondents were entitled to a complete and accurate statement of any liens existing against the Great Anthracite Coal Company that might affect the distribution of the funds in the hands of the receiver. The duty on a public official to furnish a complete and accurate certificate, when so requested, is fully commented on in Home Owners' Loan Corporation Tax Case, 149 Pa. Superior Ct. 440.

If, on May 10, 1948, the official records of the Department of Revenue at Harrisburg did contain the date of the original settlement of April 23, 1941, it might be possible that a clerk on May 10, 1948, could have missed that item in preparing the certificate bearing that date and which was issued at the request

of respondents. However, it would appear wholly unlikely that another clerk in that section of the Department of Revenue on a date nearly two months later, to wit, on July 8, 1948, would have again missed or overlooked that item in making up a second certificate of lien. It will be noted that this lien certificate was to be a certification "of all liens" then standing against the Great Anthracite Coal Company and we are of the opinion the statements contained in this certificate of lien issued to respondents on July 8, 1948, should be binding on the Commonwealth.

It will be noted this "Lien Certificate" bearing date of July 8, 1948, shows on its face that it was furnished under the provisions of section 213 of The Fiscal Code, supra (72 PS §213). This section of that act provides that the Department of Revenue is required to furnish, upon the payment of a fee of 50 cents, "a certificate showing the character and amount of *all liens* that may be of record in the Department against any corporation", and therefore such certificate should contain a *complete* record of *"all liens"* in the office of the Department of Revenue. (Italics supplied.) We are of the opinion that the Department of Revenue is bound by its certificate issued on July 8, 1948, and it cannot, where a purchaser or a subsequent title owner is involved, question the accuracy of its own certificate as to the status of the liens on record in its office.

This same question was raised before the Court of Common Pleas of Luzerne County in Commonwealth v. Smith, 37 Luz. 367. In that case the claim of the Commonwealth was for corporate taxes against a floral company and the evidence of this claim, it appears, consisted solely of an offer of a photostatic copy of the record of the Department of Revenue which showed thereon a corporate loan tax report filed by the floral company for the year 1936. The question raised there was whether this tax could be collected from one, Smith,

who had purchased all the assets of the said floral company.

The court decided the Commonwealth had not established a valid claim against Smith under the provisions of section 1401 of The Fiscal Code and that the Commonwealth had no right to recover for said 1936 taxes because under the evidence it appeared that in 1938 the Department of Revenue furnished a statement of all tax claims of the Commonwealth against the floral company and this statement or certificate made no mention of any corporation taxes due for the year 1936.

Judge Valentine, in refusing to permit the Commonwealth to recover, said:

"Such being the facts, we are constrained to the conclusion that the Commonwealth, as against a purchaser of the personal property of the corporation, would be bound by the statement rendered by its official and that the principle enunciated by the Superior Court in Home Owners' Loan Corporation Tax Case, 149 Pa. Superior 440, should control."

It is further contended by the Department of Revenue, in the instant case, that the resettlement of July 1, 1946, does not have any existence other than as a part of the original settlement, and that this resettlement automatically takes effect as a lien from the date of the original settlement made on April 23, 1941.

It was said in Crouse et al. v. Murphy et al., 140 Pa. 335: "The intention to protect an innocent purchaser against secret liens and conveyances manifested itself very early in this state."

It is obvious for the protection of all land titles that a lien, as the act of the law, must have a definite date upon which it becomes a lien on real estate.

In the instant case the question as to whether there was one or two separate lien dates because of an original settlement and a later resettlement of a State tax brings up the essential question as to whether they are one and the same thing.

The word "settlement" is defined in Webster's dictionary as meaning "that which settles, or is settled, established, or fixed, to free from uncertainty or waver, to make sure, firm or constant; to secure to a person by a fixed arrangement; to settle the amount on a disputed account". The dictionary defines the word "re settle" as "to settle again".

. An examination of The Fiscal Code itself defines the *date of settlement* and the *date of resettlement* in language that is clear and specific and in our opinion clearly shows that the legislature intended them to be two separate dates rather than to be merged in one date.

Section 1 of The Fiscal Code of 1929 contains a definition which is helpful in this matter (72 PS §1). In this section the following is defined:

"As used in this act, . . .

" 'Date of settlement' and 'date of resettlement' shall mean,

" '(a) In the case of settlements or resettlements made by the Department of Revenue, the date upon which the settlement or resettlement shall be approved by the Department of the Auditor General; or, if the Department of Revenue and the Department of the Auditor General cannot agree, the date upon which the Board of Finance and Revenue shall decide what the amount of the settlement or resettlement shall be, or the date upon which the settlement or resettlement of the Department of Revenue becomes valid because of the failure of the Board of Finance and Revenue to decide what the amount of the settlement or resettlement shall be, within the time hereinafter prescribed; . . .' "

The Fiscal Code, in section 1102, provided for resettlements and stated that they should be handled so far as approval was concerned "as in the case of original settlements". Section 1102 of the Act (72 PS §1102) reads in part, as follows:

"In the case of petitions for resettlement filed with the Department of Revenue, the disposition of the petition shall be subject to the approval of the Department of the Auditor General, as in the case of original settlements, and, if the two departments shall be unable to agree, the case shall be submitted to the Board of Finance and Revenue by the Department of Revenue. The Board of Finance and Revenue shall decide every such case within three (3) months from the date of the submission thereof, and, in case of its failure to reach a decision within such period, the disposition of the Department of Revenue shall automatically become valid, and the Board of Finance and Revenue shall immediately return to the Department of Revenue all of the papers appertaining to the case.

"In the case of petitions for resettlement filed with the Department of the Auditor General, the petition shall be disposed of by the joint action of that department and of the Treasury Department, as in the case of original settlements."

Section 1105 of The Fiscal Code makes the same distinction (72 PS §1105). It provides, inter alia:

"Whenever a resettlement shall have been made hereunder, the Department of Revenue shall resettle the account *according to law.*" (Italics supplied.)

Section 8 of the Corporate Net Income Tax Act of May 14, 1947, P. L. 232 (72 PS §3420h) contains somewhat similar language:

"Whenever a resettlement shall have been made hereunder, the department shall resettle the account *according to law. . . .* The resettlement shall be subject to audit and approval by the Department of the Auditor General *as in the case of original settlement.*" (Italics supplied.)

Settlement has been defined as an administrative determination of the amount due: Commonwealth v. Erdenheim Farms Co., 55 Dauph. 17 (1944); and in that case Judge Hargest decided that it was a lien and

a final settlement "only when it has the approval of the Department of the Auditor General". The courts have also held that nothing can increase the amount which is legally a part of the original settlement: Commonwealth v. West Penn Power Co., 50 D. & C. 265; and that interest upon an unpaid tax claim does not later become a part of the lien after the settlement of the tax unless the interest is also settled: Commonwealth v. Corner Realty Co., 45 D. & C. 199.

Judge Bok, in Commonwealth v. Corner Realty Co., supra, in interpreting section 1401 of The Fiscal Code, said at page 201:

"We do not believe that interest becomes part of the lien in the same way that interest is said to follow a judgment. No case has been decided on the point at issue under any of the acts cited. The nearest thing to it is an obiter dictum by Mr. Justice Barnes in Commonwealth vs. Southern Pennsylvania Bus Co., 339 Pa. 521 (1940) where he says, at page 531: 'It is difficult to understand in what manner the provision for interest violates the requirement of due process. Before the charge can be imposed there must be a settlement of the deficiency, and of the interest.' It is our conclusion that interest does not become part of the lien of settled taxes unless the interest is also settled. . . . Our ruling simply deprives the Commonwealth of its position as a lien creditor and makes it a general creditor, but its claim for interest is as good as it ever was."

The Commonwealth, when it revised the 1939 corporate net income taxes of the Great Anthracite Coal Company, could revise its claim so far as the amount was concerned to collect interest from 1941 but it could not go back and change its lien. Its lien only began at the time of resettlement as defined in The Fiscal Code and that was July 1, 1946.

It would logically follow from a reading of these cases that the Commonwealth, if it had a lien at all on

April 23, 1941, only had a lien in the amount of $42.24 and since that amount was *paid* prior to the settlement, therefore, it had no lien at all on April 23, 1941. When the tax was resettled under the provisions of the Corporate Net Income Tax Act on July 1, 1946, the resettlement in the amount of *$3,899.45* was a lien only from *July 1, 1946,* and did not become a lien *retroactively from April 23, 1941.*

Respondents questioned the right of the Commonwealth to resettle the corporate net income tax *after* a period of *two years* following the original settlement and the interpretation of section 8 of the Corporate Net Income Tax Act (72 PS §3420h) was argued. That section requires the Commonwealth, in order to prove it was justified in resettling the tax after the two-year period, to show that: (1) A return was filed by the tax-paying corporation with the Federal Government, and that (2) such return, as filed, was changed on audit by the Federal Government. The exact language of section 8 reads:

"If, within a period of two years after the date of any settlement, the department is not satisfied with such settlement, or if at any time the net income as returned by any corporation to the Federal Government is finally changed or corrected by the Commissioner of Internal Revenue or by any other agency or court of the United States with a result that tax, in addition to the amount paid, is due under this act, the Department is hereby authorized and empowered to make a resettlement. . . ."

The witness for the Department of Revenue did not know whether the tax-paying corporation had filed a return with the Federal Government for the year 1939. He only knew that the Federal Government had reported a change and that the income of the subject corporation to the Federal Government was greater than that reported to the State Government for the same year. A strict construction of the act would require

the Commonwealth to show: (1) That the return *by the corporation* had been filed with the Federal Government and, (2) that that return as filed had been changed by the Federal Government.

In view of the foregoing authorities and the reasons set forth we conclude that this claim of the Department of Revenue of the Commonwealth of Pennsylvania against this fund of royalties in the hands of the receiver must be dismissed, because it was not a lien upon the real estate of the Great Anthracite Coal Company prior to the conveyance of said real estate of that company to other persons or corporations as hereinbefore set forth.

It is to be understood this does not affect the right of the Commonwealth to proceed against the Great Anthracite Coal Company for the purpose of collecting such taxes as may be properly due by that corporation to the Commonwealth.

We are of the opinion that the County of Northumberland, which holds these coal lands as trustee for all the taxing districts involved (see Zerbe Township School District et al. v. Thomas et al., 353 Pa. 162), and Edward J. O'Rourke, receiver appointed by this court to operate said coal lands and receive royalties from the coal mined thereon, are in the legal position of innocent purchasers of these lands for value without notice.

### Conclusions of law

The court finds the following conclusions of law:

1. The Department of Revenue of the Commonwealth of Pennsylvania has no liens on said tracts here involved which would permit the Commonwealth to share in the distribution of the coal royalties in the hands of Edward J. O'Rourke, receiver.

2. The tax settlement for the year 1939, made on April 23, 1941, never constituted a valid lien on the lands of the Great Anthracite Coal Company as the corporate net income taxes for 1939 had been paid

by said coal company more than a year before the date of said settlement.

3. The tax settlement made on April 23, 1941, constitutes only a record of a tax already paid by the Great Anthracite Coal Company on February 3, 1940.

4. The Act of June 15, 1911, P. L. 955, sec. 1, as amended and incorporated into The Fiscal Code of April 9, 1929, P. L. 343, which provides that all State taxes shall be a first lien upon the franchise and property of a corporation from the date of settlement, clearly was intended to mean such taxes as remained unpaid at the time of settlement and not a tax that had already been paid.

5. The Department of Revenue of the Commonwealth of Pennsylvania had no lien on the real estate of the Great Anthracite Coal Company, involved in this proceeding, prior to July 1, 1946, which is the date of the resettlement by the Department of Revenue.

6. The County of Northumberland, as trustee for the various taxing districts involved, is the present owner of the lands that produced the coal royalties about to be distributed by the receiver, and as such trustee is in the same category as an innocent purchaser for value without notice.

7. The receiver may proceed forthwith to file his schedule of distribution of the net amount of royalties in his hands from his first and second annual accounts without making any allowance to the Commonwealth of Pennsylvania on its claim for corporate net income taxes due from the Great Anthracite Coal Company.

8. The claim of the Department of Revenue of the Commonwealth of Pennsylvania is dismissed so far as sharing in any royalties in this distribution of funds in the hands of the receiver.

### Order

And now, to wit, August 10, 1948, it is ordered, adjudged and decreed that the claim of the Commonwealth of Pennsylvania be, and the same is, hereby dis-

530

missed so far as sharing in any royalties in the hands of Edward J. O'Rourke, receiver, arising out of the first and second accounts in said receivership. The receiver is hereby directed to proceed with his schedule of distribution in accordance with the order of court heretofore filed in the above matter.